426 So.2d 636 (1982)
Walter YOUNG
v.
STATE FARM FIRE & CASUALTY INSURANCE COMPANY, et al.
No. 82 CA 0026.
Court of Appeal of Louisiana, First Circuit.
December 21, 1982.
Rehearing Denied February 24, 1983.
Writ Denied March 18, 1983.
*638 Byard Edwards, Jr., Ponchatoula, and Paul Billingsley, Hammond, for plaintiffs.
Iddo Pittman and Alton Lewis, Jr., Hammond, for defendant-appellant State Farm.
James Moore, Baton Rouge, for defendant, John Garcia.
Bernard Smith, Covington, for intervenor.
Before COLE, WATKINS and ELLIS, JJ.
COLE, Judge.
The major substantive issues in this complicated suit on a fire insurance policy are whether or not plaintiff, Walter Young, had an insurable interest in the insured property, and whether or not defendant, State Farm Fire & Casualty, proved Walter Young committed arson.

*639 PRELIMINARY FACTS
In 1971 Robert Young purchased a tract of land on Lee Hughes Road, north of Baptist, Louisiana. In 1973 or 1974, his father, Walter Young, commenced constructing a house for Robert on this tract of land. Early in 1976, when the house was near completion, Robert indicated to his father he had changed his mind about wanting to live in the new house. Instead, he preferred to continue living in a small house on Highway 51 in order to be near his grandmother. Walter agreed to purchase the house from Robert and various transactions were executed to that effect. In early 1977 Walter and two male friends moved into the house. The written act of sale was executed on March 25, 1977, and the house was completely destroyed by fire on April 17, 1977.

PROCEDURE
Walter Young filed suit to recover proceeds from a fire insurance policy issued by defendant State Farm Fire & Casualty Insurance Company. Mr. Young also sought to recover statutory penalties and attorney's fees for State Farm's wrongful refusal to pay benefits. Mr. Young's son, Robert Young, also joined as plaintiff, claiming he held a mortgage on the damaged property. State Farm defended the suit on the basis of arson and a lack of insurable interest. State Farm also brought a reconventional demand against Walter Young for $15,000, the amount paid to his mortgagee under a loss payee clause in the policy. Following a trial on the merits, the jury rendered a verdict in favor of Walter Young, which included awards for loss of the dwelling, the loss of contents therein and additional living expenses. The judgment also included interest, penalties, and attorney's fees. The claim of plaintiff Robert Young and the reconventional demand of State Farm were dismissed. State Farm now appeals, alleging some thirteen assignments of error.

INSURABLE INTEREST

Background Information
Much evidence at trial concerned whether or not Walter Young had an insurable interest in the insured property. Walter testified he felt compelled to provide for Robert, his epileptic son. He built the house "a little bit at a time," according to how much extra money he had. In addition to his own funds he borrowed $15,000 from First National Bank of Denham Springs. The loan was secured by a $15,000 first mortgage on the property. Milton Coxe, a former loan officer at the bank, testified although the loan was actually in Robert's name and contained Robert's signature, it was considered to be Walter's loan. Other testimony revealed Robert allowed his father to handle most of his business dealings, and in some instances Walter actually signed Robert's name to certain documents.
On February 16, 1976, while the house was under construction, Walter contracted with State Farm for an insurance policy on the house and its contents. The policy was in Robert's name. Shortly thereafter Robert informed his father he did not want to move into the house; therefore, Walter decided to buy the house from Robert.
In exchange for the house, Walter assumed the First National Bank note, which he refinanced with Magee Finance. (The loan was refinanced because of pressure from First National Bank for Young to repay the loan on monthly installments, rather than on demand.) Walter also gave Robert a note for $15,000, which was secured by a second mortgage on the property. Further, Walter purchased his mother's and siblings' interest in the house located on Highway 51 and transferred this property to Robert.
The agreement concerning the new house occurred allegedly in late 1976, pursuant to oral committments. The Youngs approached attorney (now judge) Brent Dufreche concerning the necessary paperwork; however, the authentic act of sale was not passed until March 25, 1977.
At trial plaintiffs introduced an unrecorded handwritten act of sale which had been drawn up by Mr. Coxe in connection with the refinancing of the property. State Farm questioned the authenticity of this *640 document because it was discovered in Mr. Coxe's home only one week prior to trial. Further, an affidavit by Robert Young stated "the sale between my father and myself took place without any writing until Attorney Brent Dufreche in Ponchatoula did the sale for me to put it in writing."

Issues on Appeal
State Farm raises two errors committed by the trial court as regards to the insurable interest issue. One, State Farm contends the jury instructions on the law of transfer of immovable property and on insurable interest were insufficient. Two, State Farm argues since the authentic act of sale was not executed until March 25, 1977, Walter had no insurable interest in the property when he contracted for the subject policy in February of 1977.
First, we need not dwell upon the sufficiency of the jury instructions because we conclude there was sufficient evidence to establish Walter had an insurable interest in the property. Even if we were to find the instructions inadequate we must decide the issue on our own rather than remanding to the trial court. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). In such a case it is our constitutional duty to review the facts as well as the law. La. Const. art. 5 § 10(B). We are then to render judgment based upon the record. La. Code Civ.P. art. 2164.
Even if there had been no valid sale of the property before the policy was written, the record shows Walter had an insurable interest in the property, nevertheless. La.R.S. 22:614 requires the insured to have an insurable interest in the property covered by the policy in order for the policy to be enforceable. The statute defines insurable interest as "any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage." This definition does not require an ownership interest in order to have an insurable interest. State Farm Mut. Auto. Ins. Co. v. Price, 378 So.2d 599 (La.App. 3d Cir.1979). See Stokes v. Republic Underwriters Ins. Co., 387 So.2d 1261 (La.App. 1st Cir.1980) and Brewster v. Michigan Millers Mutual Insurance Co., 274 So.2d 213 (La.App. 2d Cir.1973).
In Brewster, a father was held to have an insurable interest in a house he built for his sons because he had retained possession and control of the house, the right to live in it, rent it to others, or to use it as he wished. In Stokes, a woman was held to have an insurable interest in her aunt's house because she lived there with her aunt's permission. Even though the woman could not demand she be allowed to stay in the house, her right of occupancy was deemed to have some pecuniary value. In Price, a good faith purchaser of a stolen automobile was held to have an insurable interest, even though he did not actually own the car. The insurable interest was derived from his possession of the car and his interest in preserving the car due to the substantial sum he had paid for the car's repair.
Likewise, Walter Young had a substantial economic interest in the house's preservation, since he had invested much time and money in its construction. Also, he was in actual possession of the house for three or four months prior to the fire. This right of occupancy alone gave Walter an insurable interest.

ARSON

Sufficiency of State Farm's Pleadings
Walter Young contends the defense of arson (which is a type of fraud) should not be considered because it is an affirmative defense that was not included in the pleadings. The defense of arson has been characterized as an affirmative defense. See Tolbird v. Southern Insurance Company, 130 So.2d 535 (La.App. 2d Cir.1961), cert. denied 1961. As an affirmative defense, alleging fraud, it must be plead with particularity. See La.Code Civ.P. arts. 856 and 1005.
When Walter Young filed a claim for his fire loss, State Farm declined to pay, stating they suspected the fire was set deliberately and they were conducting an investigation *641 as to the origin of the fire. After suit was filed, State Farm's answer contained a general denial which stated the "fire and destruction of the residence and contents was caused by the intentional act either directly or indirectly of Walter Young...."
Prior to trial, in response to an interrogatory propounded by plaintiffs concerning the origin of the fire, State Farm answered, "investigation reveals that the fire was of incendiary origin." A later response to a similar question was, "Because combustibles were found in the house; because of the nature of the fire; and because of the various surrounding circumstances." State Farm further stated in another answer to an interrogatory it believed gasoline and kerosene were used to start the fire, and the stove or other devices could have been used to ignite the combustible material.
Although State Farm's pleadings were rather conclusory, the evidence concerning arson was properly considered. The plaintiff was fairly apprised of the nature of the arson defense before trial from both the allegation in defendant's answer and from the answers to interrogatories. See First Fed. Sav. & L. Ass'n v. National Old Line Ins. Co., 254 So.2d 497 (La.App. 3d Cir.1971).

Facts Concerning Arson
The fire was discovered by Robert and Imelda McLee, who lived next door to the Young house, at approximately 2 A.M. on April 17, 1977. The McLees testified they were awakened by a loud popping and crackling noise and observed extremely high flames which had spread to trees in their own yard. The McLees immediately notified the fire department. Walter Young and two friends, Jimmy Haltom and Jack Long, lived in the house at that time but none were present when the house burned.
Walter Young, a truck driver by trade, testified he had been in the house the afternoon of April 16 but had left at approximately 8 P.M. to travel to Texas. In support of this testimony he offered a record from the U.S. Customs officials in Progresso, Texas, showing he had purchased gasoline in Mexico on April 17, 1977. Jack Young stated he too had been in the house the afternoon before the fire but had left that day for Tennessee to pick up an automobile. Jimmy Haltom testified his girlfriend picked him up from work the afternoon of April 16. He accompanied her to Baton Rouge and did not return to the house until 5:30 A.M. on April 17, when he learned the house had burned.
Mr. Harold Meyers, an expert in damage engineering and specialist in determining the origin of fires, testified his investigation of the remains of the house led him to conclude the fire had been set intentionally. Mr. Meyers stated he believed the fire had been preceded by an explosion because a window had been found some 33 feet away from the house with only a slight amount of heat damage. Since the house had only electric utilities and no gas connection he believed such an explosion could be caused only by arson. Mr. Meyers also testified two burners on the stove appeared to have been turned on at the time of the fire. He found what appeared to be trail of rags leading from the stove to the other rooms in the house. These samples, along with a rag found in the kitchen, were examined by a chemist, Mr. Reginald Daughdrill. Mr. Daughdrill testified the rag from the kitchen may have contained kerosene, the padding from the bedroom contained very minute traces of a C-9 organic compound, and the carpet padding in the living room most definitely contained traces of an organic compound in the C-9 to C-13 range which was a type of heavy gasoline.
Based on this information Mr. Meyers concluded the stove had been used as a triggering mechanism to ignite the rags which led to other gasoline soaked rooms in the house. An empty gasoline can found in the garage area supported this theory. Mr. Young said it was used for his lawn mower; however, no lawn mower was found in the debris. Mr. Thomas Mego, an investigator for the State Fire Marshall's office, testified he too believed the fire was caused by *642 arson, based on the fire pattern and the fact the house was so totally consumed.
This theory concerning the gasoline soaked rags was refuted to some extent. Other testimony indicated all three men who lived in the house did mechanic's work and often left oil and gasoline soaked rags lying around the house. Mr. Daughdrill, on cross-examination, admitted the test he did on the rag and carpet samples was a qualitative rather than a quantitative one, though he believed there were more than just minute traces of organic compounds on the samples. Also, even though the rags were used allegedly as a fuse to lead the fire to other rooms in the house, photographs of the debris offered to support the Meyers' theory showed the rags themselves were not burned, but were found intact under some debris. Expert testimony was also introduced to show other possible causes of a house exploding during a fire.
State Farm further attempted to establish plaintiff had a motive to burn the house. It claimed Walter Young had no need for the house since his son refused to accept it and because Walter stayed in the house an average of only five nights each month due to the extensive travel involved in his work. Though Walter denied it in an interrogatory, he admitted on the stand he had signed his son's name to a listing agreement with the Norwood Smith Real Estate Agency. However, plaintiff contended the agreement was signed only at the insistence of a good friend, Mr. Russell Haltom (Jimmy Haltom's brother), and Mr. Young later asked Mr. Haltom not to show the house since he really did not want to sell it.
In an effort to establish a motive State Farm also attempted to show Mr. Young was in financial trouble. Evidence was introduced showing he had been declared bankrupt in 1975 and he had not made a single payment on the $15,000 mortgage note he gave to Magee Finance. However, Mr. Young seemed able to provide financially for his three sons. He had bought each either a house, car, boat or business. Additionally, Milton Coxe, formerly with the Citizens National Bank in Ponchatoula and the vice-president of the First National Bank of Denham Springs, testified Mr. Young's credit rating was not bad, and stated he had continued to loan him money after the fire.

Jury Instructions Concerning Arson
After the twelve days of trial in which the above testimony was heard, the jury rejected the arson defense and found in favor of Mr. Young. On appeal, State Farm contends the verdict was the result of erroneous and prejudicial jury instructions which raised the burden of proof required to prove arson. State Farm alleges the court should have instructed the jury arson needs to be proved only by a preponderance of the evidence but instead gave instructions which stated arson must be shown by "strict proof." State Farm contends this estabished in the jury's mind a requirement close to the criminal burden of proof beyond a reasonable doubt. Defendant further complains about the instruction that "arson must be established by a proof of such import that it will sustain no other reasonable hypothesis but that the insured was responsible for the loss."
In Rist v. Commercial Union Ins. Co., 376 So.2d 113 (La.1979), the Supreme Court stated, page 114, the "sole issue ... is whether ... [the defendant] established by a clear preponderance of the evidence that the fire in question was of incendiary origin and that [plaintiff] was responsible for it." The Rist court, noting the proof was strictly circumstantial, also stated the evidence in the case was of such import it would sustain no other reasonable hypothesis but that the plaintiff was responsible for the fire. This latter version of requisite proof has been held to be applicable when the insurer relies solely upon circumstantial evidence, as State Farm did in this case. Wallace v. State Farm Fire & Cas. Ins. Co., 345 So.2d 1004 (La.App. 2d Cir.1977), writ denied 1977.
We agree the jury instructions were inadequate in that they did not include defendant's requested instructions that the "proof may be and invariably is circumstantial."
*643 However, as mentioned above, even though the jury instructions may have been inadequate, we must decide the issue on our own rather than remanding to the trial court. Gonzales, supra.
Here we cannot say the record does not support the jury's verdict. For this court to reverse, we would have to find State Farm proved by a clear preponderance of the evidence both that the fire was of incendiary origin and that Mr. Young was responsible for it. Yet, substantial evidence was introduced to rebut both the evidence concerning the incendiary nature of the fire and the evidence which attempted to establish a motive on the part of Mr. Young.
This rebuttal evidence provided other possible explanations for the cause of the fire, including the possibility of spontaneous combustion of oily, greasy rags. It also established reasonably that the house was underinsured. Plaintiff allegedly bought the house for $55,000. Weldon Russell, an expert real estate appraiser, testified the house had a replacement value of $66,550.40 at the time of his report in August 1981, and a value of $51,869 at the time of the fire in 1977. The house was insured for only $41,700. In light of this and other rebuttal evidence mentioned above, we cannot say the jury's verdict was contrary to the clear weight of the evidence. The evidence concerning Mr. Young's motive to burn the house is not convincing enough for us to conclude it is more probable than not he was responsible for the destruction of his home. Viewed another way, the evidence is of such import it does sustain other reasonable hypothesis for the cause of the fire. We therefore affirm the award for loss of the house.

AWARD FOR CONTENTS AND LIVING EXPENSES
State Farm contends plaintiffs did not prove adequately the value of the contents; rather, State Farm argues the claim for contents amounted to falsification and fraud of such a nature as to void the policy. Extensive testimony was introduced regarding the contents of the house at the time of the fire and the value thereof. After hearing all the evidence, the jury awarded Mr. Young $16,000 for unscheduled personal property. (The policy coverage on contents was for $20,850.)
Mr. John Garcia, a State Farm insurance adjuster, met with Mr. Young a few days after the fire and gave him inventory forms to assist him in making his claim. When the original inventory was taken, Young told Garcia ninety-five percent of the contents had been purchased within twelve months of the fire from the Christmas Tree House in Houston, Texas or from Kieffer's Imports in MacAllen, Texas. The purchases from the Christmas Tree House could not be corroborated since it had subsequently gone bankrupt and because Mr. Young had no receipts. Kieffer Imports was found to be a truckstop-warehouse run by Mr. Bill Kieffer, a friend of Young's. Kieffer allegedly gave Young several pieces of expensive hand-carved mahogany furniture from Mexico in lieu of a cash payment for a load of tires which Young had delivered to Houston. State Farm argues the evidence does not sufficiently prove the value or existence of the furniture allegedly supplied by Kieffer. State Farm contends since Mr. Kieffer was present in Tangipahoa Parish at the time of trial the failure of plaintiff to call Kieffer created a legal presumption his testimony would have been adverse to plaintiff. However, this presumption does not apply when the witness is equally available to both parties. Hemphill v. Strain, 371 So.2d 1179 (La.App. 1st Cir.1979), writ refused 1979; Ellis v. Coleman, 309 So.2d 716 (La. App. 4th Cir.1975). Thus, the trial judge did not err in denying instructions regarding this presumption. At the time of trial Mr. Kieffer was present in Tangipahoa Parish to care for an ill friend. State Farm was aware of his presence and could have called him to testify about the furniture.
State Farm's main contention regarding false swearing was that a second contents inventory prepared years after the *644 fire, in 1981, differed substantially from the original inventory which was prepared shortly after the fire. The later inventory was prepared in response to State Farm's interrogatories and was written with the assistance of counsel and the two men who were living with Young at the time of the fire. The original inventory reflected the contents to be worth $22,835, while the later inventory showed a value of only $16,370. Although the second inventory did differ substantially as to the specific contents of the house and as to the value thereof, we do not find this discrepancy in itself to constitute fraud or misrepresentation by the insured. G.U. Rybiski & Co. v. La. Coastal, Etc., 369 So.2d 1097 (La.App. 1st Cir.1979).
The second inventory also stated a substantial amount of the house's furniture and appliances had been purchased from Slidell Furniture Company in 1975 and 1976. However, defendant showed the Slidell Furniture Company had gone out of business in 1974. This discrepancy was explained by Mrs. Leak Magee, a co-owner of Slidell Furniture Company and a niece of Walter Young. She testified when her store went out of business, much of the remaining furniture was placed in a Mandeville home. She stated Mr. Young had purchased a substantial amount of high quality furniture and appliances from the Mandeville stock for the home he was building. She later visited the Young residence and found it to be "almost cluttered" with high quality furniture, including the disputed mahogany Mexican dining room set. Though no traces of the dining room furniture were found in the debris, Mr. Garcia admitted on the stand such wooden items can be burned without leaving any recognizable remains. He also testified, however, remnants of metal, not wooden, furniture were found in the dining area.
Although the testimony on the contents of the house was hotly contested and highly conflicting, we do not find the record shows Mr. Young engaged in false swearing with intent to defraud State Farm. After listening to the evidence, including Mr. Young's and Mr. Haltom's descriptions of the contents of the house when it burned, the jury apparently felt the testimony was credible enough to justify an award of over three-fourths of the insured value of unscheduled personal property. We cannot say this award is tantamount to manifest error.
Nor do we believe the jury instructions regarding the proof required for loss of contents were erroneous. According to Tolbird, supra, to establish a claim for loss of contents, an insured is not required to produce supporting vouchers or receipts from stores where the insured items were purchased. In that case, a written list prepared by plaintiff listing each item of personal property and the cost thereof, to the best of his knowledge and ability, was held to be sufficient proof. Thus, the reasoning in Tolbird is consistent with the jury instruction: "Where the best evidence available is plaintiff's testimony that is sufficient to establish proof of loss."
In this case, the proof was based upon lists prepared by the plaintiff and the other residents of the house and also upon the testimony of Mr. Joe Vutura, a furniture dealer. Vutura testified as to the suggested retail value of furniture similar to that described as destroyed in the fire. Plaintiffs also introduced numerous photographs of the debris from which the remains of various pieces of furniture could be identified. Although Vutera's testimony might have been misleading since it was based on the retail value of new furniture, we find plaintiffs used the best available evidence to prove the identify and value of the lost property. We therefore affirm the $16,000 award for unscheduled personal property. We see no abuse of discretion in the amount of this award. See, Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976), rehearing denied 1977.
State Farm also appeals the award of $8,340 for additional living expenses, since Mr. Young introduced no evidence to show such expenses were actually incurred. The testimony of Mr. Young shows he *645 stayed in the house only about five days each month because he spent much time travelling. After the fire, and up until the time of trial, he lived with his son in the small house on Highway 51, where he had lived before moving into the house which burned. However, Young argues even if no additional expenses were incurred, he is still entitled to the fair value of what it would have cost to maintain the same standard of living as he had enjoyed in the larger house. This argument is contrary to the language of the policy which states it "covers the necessary increase in living expense incurred by the Named Insured to continue as nearly as practicable the normal standard of living...." (Emphasis added.) Since no evidence was introduced to show additional living expenses were actually incurred, and since none seemed to have been necessary to maintain Mr. Young in a standard of living similar to that of which he was accustomed, we reverse the award for additional living expenses. This award was contrary to the evidence presented and was clearly wrong.

PENALTIES, ATTORNEY'S FEES AND EXPERTS' FEES
State Farm complains the jury erroneously awarded attorney's fees and penalties. La.R.S. 22:658 provides an insurer who arbitrarily refuses to pay a claim within 60 days of satisfactory proof of loss shall pay a penalty of 12% damages on the total amount of the loss, plus reasonable attorney's fees. Since R.S. 22:658 is a penal statute, it must be strictly construed and the penalty must not be assessed unless the refusal to pay was arbitrary, capricious or without probable cause. Headrick v. Pennsylvania Mutual Ins. Co., 257 La. 1101, 245 So.2d 324 (La.1971), rehearing denied 1971.
In a case such as the present one, in which there were admittedly suspicious circumstances surrounding the fire, State Farm was within its rights in refusing to pay the claim and in litigating the matter based upon the arson defense. See Headrick, supra and Stokes, supra. We therefore reverse the judgment insofar as it awarded 12% penalties and $27,035.63 in attorney's fees. Because we reverse this award we need not address many of appellant's other assigned errors concerning these matters.
Defendant contends finally the trial court abused its discretion in awarding excessive experts' fees. After the jury verdict was rendered, the trial judge set the expert witness' fees for all plaintiff's experts at $250 per day. Mr. Weldon Russell testified as an expert real estate appraiser and was awarded a total of $750 for three days. Mr. Joe Vutera testified as an expert in furniture value and was awarded $250 for his one day of testimony. Mr. Milton Coxe testified as an expert in the banking business and in the field of applied interest rates. His fee was set at $750 for three days of preparation and testimony. Mr. Charles Bender, who testified as an expert in the field of criminal and fire investigations, was awarded $1,500 for six days of preparation and testimony.
The amount of expert fees is a matter within the discretion of the trial court and should not be disturbed unless found to be manifestly erroneous. La.R.S. 13:3666; Ditch v. Finkelstein, 399 So.2d 1216 (La.App. 1st Cir.1981). Although we find these fees to be somewhat high, they are not manifestly erroneous nor are they out of line with awards in similar cases, thus suggesting an abuse of discretion. See Williams v. Harvey, 328 So.2d 901 (La.App. 4th Cir.1976).

CONCLUSION
For these reasons, the portions of the judgment which awarded plaintiff additional living expenses, penalties, and attorney's fees are reversed; the judgment is affirmed in all other respects. Costs are to be paid by appellant State Farm.
REVERSED IN PART; AFFIRMED IN PART.